[No. A095800. First Dist., Div. Two. June 11, 2002.]

CITY OF OAKLAND, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and DAVID
GULLET, Respondents.

COUNSEL

Hanna, Brophy, MacLean & Jensen and Tom M. Hinton for Petitioner.

Vincent Bausano for Respondent Workers' Compensation Appeals Board.

David Gullet, in pro. per., for Respondent.

OPINION

RUVOLO, J.—

## I.

"No compensation . . . shall be paid by an employer for a psychiatric injury if the injury was substantially caused by a lawful, nondiscriminatory, good faith personnel action. The burden of proof shall rest with the party asserting the issue." (Lab. Code, § 3208.3, subd. (h).)[1]

The City of Oakland (Oakland) challenges a Workers' Compensation Appeals Board (Board) decision awarding temporary and permanent psychiatric disability payments to David Gullet (Gullet), a supervising employee demoted during a citywide reduction in force. The Board concluded the demotion did not qualify as a "good faith" personnel action because management personnel misled Gullet about the possibility he would avoid the demotion by accepting a different position. We conclude the Board erred by applying an incorrect standard in evaluating the conduct and in concluding Oakland did not meet its burden of demonstrating good faith. Therefore, we vacate the Board's decision.

## II.

Gullet was employed by Oakland's Parks and Recreation Department for approximately 30 years and rose through the ranks to parks supervisor II, where he also held the positions of acting area administrator and zone administrator. He worked long hours in those positions and in 1997 began to experience fatigue, muscle tightness, insomnia, anxiety, hypertension, headaches, and preoccupation with work. However, he did not seek medical treatment or lose time from work because of these problems.

The record notes that "[t]he appointment of Robert Bobb as City Manager and the subsequent election of Mayor Jerry Brown combined to create

---

[1]All further statutory references are to the Labor Code.

budgetary pressures on all City departments." Bobb targeted middle management positions like Gullet's for elimination, and in late 1998, Anthony Acosta, the director of the parks and recreation department, advised Gullet that positions like his would probably be eliminated from the 1999 fiscal year budget. He advised Gullet to "think Management Assistant."

By arrangement with Acosta, Gullet worked as a management assistant for the first five and one-half months of 1999. Acosta assured him there was budgetary authority for this arrangement. Gullet repeatedly asked why the appointment to management assistant had not been formalized and was told the "budget person" was too busy to process the paperwork. On June 16, 1999, without warning, Gullet was given a demotion letter signed by Bobb informing him that, as a result of the reduction in force, he would be reverting to a parks supervisor I position. The letter directed him to contact Lenora Hameed for the details of his new assignment beginning July 1. Gullet considered this the "last straw." He filed a workers' compensation claim and left work, after which he received psychological counseling.

Gullet's initial claim alleged "stress—entire body resulting from reduction in force notice demoting me from my position." Medical reports stated that Gullet's injury was substantially caused by his demotion. The workers' compensation judge (WCJ) concluded that "the demotion—in the context of Mr. Acosta's representation that the applicant had been promoted to a 'safe' position—was a substantial cause of the applicant's psychiatric injury." The WCJ concluded, however, that Oakland did not carry its burden of proving its personnel actions were in good faith. He awarded disability payments totaling some $25,000 and such further medical treatment as may be required. The Board denied Oakland's petition for reconsideration, and this petition followed.

### III.

The Board typically does not answer a petition for writ of review. It has done so in this case because Gullet's answer was filed in propria persona and because Oakland did not present a complete record or describe the facts of the case to the Board's satisfaction. Based upon the Board's answer, we obtained and reviewed the Board's certified record.

■ A court's review of the Board's decision may extend only to determining, upon the entire record, whether the Board acted within its powers, whether its findings of fact support the award, and whether its "order, decision, or award" was either procured by fraud, unreasonable, or not supported by substantial evidence. (§ 5952.) However, the substantial evidence rule does not limit the appellate court when, as here, the evidence is

uncontradicted and the Board's conclusion of law is placed in issue. (*Dimmig v. Workmen's Comp. Appeals Bd.* (1972) 6 Cal.3d 860, 864-865 [101 Cal.Rptr. 105, 495 P.2d 433].)

The issue presented here is whether the Board has correctly interpreted and applied section 3208.3. Section 3208.3 was part of the Margolin-Greene Workers' Compensation Reform Act of 1989, passed in "response to increased public concern about the high cost of workers' compensation coverage, limited benefits for injured workers, suspected fraud and widespread abuses in the system, and particularly the proliferation of workers' compensation cases with claims of psychiatric injuries." (*Hansen v. Workers' Compensation Appeals Bd.* (1993) 18 Cal.App.4th 1179, 1183-1184 [23 Cal.Rptr.2d 30].) As a result, "[t]he Legislature's expressed intent in enacting Labor Code section 3208.3 was to establish a new and higher threshold of compensability for psychiatric injury." (*Id.* at p. 1184; see also *Lockheed Martin Corp. v. Workers' Comp. Appeals Bd.* (2002) 96 Cal.App.4th 1237 [117 Cal.Rptr.2d 865].)

## IV.

 Citing two Board decisions (*Larch v. Contra Costa County* (1998) 63 Cal.Comp.Cases 831 and *Stockman v. Department of Corrections* (1998) 63 Cal.Comp.Cases 1042) and the California Supreme Court's wrongful termination decision in *Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93 [69 Cal.Rptr.2d 900, 948 P.2d 412] (*Cotran*), Oakland argues that its personnel decision was made in good faith as contemplated by section 3208.3 and, therefore, Gullet is not entitled to recover compensation for his alleged psychiatric injury. "In this case, the applicant's reversion to Park Supervisor I was necessitated by the City's honest and sincere purpose of streamlining its budget. It must also be noted that there is no evidence in the record indicating that anyone at the City intentionally deceived this applicant and there is also no evidence of collusion or unlawful design on the part of the City. [¶] . . . [¶] Any employer, whether public or private, will go through periods during which management will feel that budget cuts are appropriate in order to sustain the fiscal integrity of the organization. . . . [E]mployers should be able to implement such budget cuts without the fear of having to defend psychiatric injury claims filed by employees whose positions are eliminated."

Section 3208.3 does not define "lawful, nondiscriminatory, good faith personnel action" as that phraseology is used in subdivision (h), and no appellate decision cited by the parties or discovered by this court directly addresses its meaning.

In *Cotran*, the employer fired a manager after conducting an investigation into allegations he sexually harassed two employees. When the manager sued for unlawful termination—violating an implied promise not to terminate without good cause—the trial court instructed the jury that the employer was required to prove the sexual harassment took place. (*Cotran, supra,* 17 Cal.4th at pp. 96-99.) *Cotran* concluded that the question was not whether sexual harassment in fact took place, but whether "at the time the decision to terminate his employment was made, defendants, acting in good faith and following an investigation that was appropriate under the circumstances, had reasonable grounds for believing plaintiff had done so." (*Id.* at p. 109.)

*Cotran* explained that the jury's role was to "assess the *objective reasonableness* of the employer's factual determination of misconduct." (*Cotran, supra,* 17 Cal.4th at p. 103.) In complicated analysis we need not repeat here, the court described this as the "*objective* good faith standard" and explained that "coupling 'good faith' with 'objectivity' is intended to place the trier of fact in the position of the 'reasonable employer' in deciding whether the defendant in a wrongful termination suit acted responsibly and in conformity with prevailing social norms in deciding to terminate an employee for misconduct." The proper inquiry for the jury is: " 'Was the factual basis on which the employer concluded a dischargeable act had been committed reached honestly, after an appropriate investigation and for reasons that are not arbitrary or pretextual?' " (*Id.* at pp. 106-107 & fn. 3.)

Under *Cotran* the "objective" good faith standard prevented an employer from discharging an employee based on subjective reasons that might "be pretextual, and mask arbitrary and unlawful motives made practically unreviewable" by the good faith rule. But it would otherwise protect the employee in this manner "without infringing more than necessary on the freedom to make efficient business decisions." (*Cotran, supra,* 17 Cal.4th at pp. 106-107.)

While *Cotran* involved a very different context for evaluating "good faith" than the case before us, the key features in the two situations are the same. Both involved personnel decisions that might have favored one employee over another, leading to an adverse personnel action. The employer's task in *Cotran* was to conduct its personnel operations in a way that led to a reasonable determination of which employees were giving accurate accounts of the events. Oakland's task here was to reasonably implement budget-driven personnel changes, a task that inevitably pitted employees against each other and was apt to lead to personnel actions adverse to some employees.

■ Our study of the complex legislative history of section 3208.3 leads us to conclude that the statute's "good faith personnel action" provision has

a meaning similar to the context in which it is used in *Cotran*. Despite a series of changes to section 3208.3 that dropped an explicit distinction between "regular and routine" events and "sudden and extraordinary employment conditions," we conclude the Legislature's "good faith personnel action" exemption is meant to furnish an employer a degree of freedom in making its regular and routine personnel decisions (such as discipline, work evaluation, transfer, demotion, layoff, or termination).[2] If a regular and routine personnel decision is made and carried out with subjective good faith and the employer's conduct meets the objective reasonableness standard, section 3208.3's exemption applies. *Cotran* essentially states this standard for evaluating the employer's conduct in the wrongful termination setting.

Thus, we agree with the Board's importation of the objective good faith standard from *Cotran*. The Board had earlier attempted to define good faith in its decision in *Larch v. Contra Costa County*, *supra*, 63 Cal.Comp.Cases 831, filed July 10, 1998. Moving beyond the typical description of "good faith" as " 'honesty in fact in the conduct or transaction concerned,' " *Larch* quoted extensively from *Cotran*, borrowing the "objective good faith standard" and explaining in its own words that "[a]ny analysis of the good faith issue, therefore, must look at the totality of the circumstances, not a rigid standard, in determining whether the action was taken in good faith. To be in good faith, the personnel action must be done in a manner that is lacking outrageous conduct, is honest and with a sincere purpose, is without an intent to mislead, deceive, or defraud, and is without collusion or unlawful design." (*Larch, v. Contra Costa County*, *supra*, at pp. 836-837.) Similarly, in *Stockman v. Department of Corrections*, *supra*, 63 Cal. Comp.Cases 1042, filed two weeks later, the Board applied essentially the same good faith definition to a prison warden's decision to transfer an associate warden to another correctional institution.

The WCJ purported to apply this standard in assessing the personnel action taken against Gullet, concluding that Oakland's actions did not meet it. The WCJ was most impressed that Acosta represented to Gullet that Gullet had been hired as a management assistant, leading Gullet to believe he would be saved from "Mr. Bobb's axe" when he was not. The WCJ admitted he did not know whether Acosta intentionally deceived Gullet or was himself surprised when higher authorities transferred a different employee to the management assistant position (transferred as part of the resolution of another workers' compensation claim).

In either case, the effect of not receiving the management assistant position on Gullet was found to be devastating. As explained by the WCJ,

[2]See Statutes 1989, chapter 892, section 25, page 3003.

"[w]hat made the demotion so traumatic for [Gullet] was its radical inconsistency with the promises made to him by Mr. Acosta. If Mr. Acosta's promises had been kept, the demotion would not have applied to [Gullet]. Because Mr. Acosta either lacked the authority to hire [Gullet] as a Management Assistant, or because his hiring decision was countermanded by higher authorities, the employer's personnel actions were not made in good faith. [Gullet] was deceived by the totality of the City's action with respect to the Management Assistant position."

The WCJ explained his ruling again in his report on the petition for reconsideration: "The petition does not even mention Mr. Acosta's representations to [Gullet] that he had full authority to hire him as a management assistant. The employer's good faith, or lack thereof, can only be evaluated in the context of the promises made to [Gullet] by his supervisor in late 1998 and early 1999. Although the City had an opportunity to call Mr. Acosta as a witness, it chose not to. [Gullet]'s credible testimony remains unrebutted. Because [Gullet] was *demoted* from a position that he had every reason to believe he no longer occupied because of a previous *promotion*, the employer's personnel actions, under the totality of the circumstances, were not carried out in good faith. [¶] The defendant asserts, without evidence, that [Gullet] was not intentionally deceived by anyone. Because good faith is determined under the objective standard, proof of intentional deception is not required. However, the employer's own witness testified that Mr. Acosta did not have the authority to tell [Gullet] that he would definitely be hired as a management assistant. [Gullet] relied on Mr. Acosta's assurances. When they turned out to be empty, he suffered an injury. An employer may not make empty promises to an employee and later claim the benefit of the statutory defense when they cause injury." In sum, it was not the demotion itself, but the fact that Gullet was given a period of false hope the demotion would not affect him, that prevented Oakland's action from qualifying as a good faith personnel action.

■ Faced with these facts, the WCJ and the Board misapplied the word "objective" in the "objective good faith" concept they had properly imported from *Cotran*. Although the WCJ correctly concluded that outrageous conduct or bad intent would show absence of good faith, the WCJ found a lack of good faith when the employer's conduct was objectively reasonable and nothing outrageous was done and no bad intent was suggested. The WCJ concluded that the character of Oakland's conduct was not in good faith because the reassurances of job protection given Gullet were unfounded, although these acts did not intentionally mislead Gullet.

The Board here misapplied the "objective good faith" standard so that it did not merely prevent an employer from masking arbitrary and unlawful

motives. Instead, it introduced a "no fault" concept into the section 3208.3 decision—in complete antithesis to *Cotran*. Under the Board's analysis, even if the employer were trying to do its best by Gullet, its action would not be in good faith if it failed in its purpose and thereby caused psychiatric injury. The Board converted the employee's "objective" shield into a sword.

The only adverse personnel action was Gullet's demotion, which appears to have been justified by fiscal concerns rather than any unlawful animus toward him. Had Oakland done no more than send Gullet the June 16, 1999 termination letter, section 3208.3, subdivision (h) clearly would have exempted it from his claim. Likewise, had Oakland never demoted Gullet, but simply transferred him to a position he could not permanently occupy and then retransferred him back, it is unlikely he could have succeeded on a claim for an industrial injury. But when those two routine personnel actions were combined, in the Board's view Oakland lost its "good faith personnel action" defense because it gave Gullet false hope he would not be demoted.

According to the Board, regardless of motives, a manager is not acting in good faith if the apparently beneficial step he or she takes creates false hopes that are not ultimately realized by the employee. The Board's decision in this case sends the wrong signal to managers and employers. It suggests Oakland should simply have let the axe fall and not tried to protect its employee by transferring him to another position. It counsels employers not to seek to help employees avoid demotions because they might create false hopes. We conclude that even if mistakes were made in carrying out the demotion and attempting to protect Gullet from it, this was a good faith personnel action within the meaning of section 3208.3.

Tactically speaking, Oakland may also have made a mistake in not calling Acosta to testify about what he did and why. Oakland's subjective good faith would certainly have been better demonstrated, and the WCJ and Board perhaps would have been persuaded in Oakland's favor by direct testimony. However, Oakland's burden was satisfied when the evidence before the Board, consisting primarily of Gullet's testimony, demonstrated that Oakland's personnel action against Gullet was a good faith action within the meaning of the statute. Gullet's testimony supplied everything needed to establish this defense for, even from his testimony, it is clear that Acosta was simply trying to help him avoid becoming a budgetary casualty.

The evidence shows that "Mr. Bobb's budgetary axe was aimed at middle management positions like the applicant's," that Gullet's boss warned him that his position would probably be eliminated and suggested he think about a management assistant position. Acosta discussed a specific position with

Gullet, told him about salary and benefits and "formally offered the position to the applicant and assured him that there was budgetary authority for him to do so." Gullet worked in the position for five and one-half months. We cannot characterize the foregoing as anything other than good faith personnel activity.

According to a Gaynell Chase, disability benefits coordinator for Oakland, another employee was transferred into the sole parks and recreation department management assistant position in 1999 (the one Gullet thought was reserved for him) as part of the resolution of her workers' compensation claim. Chase stated that Acosta could properly have told the applicant that a management assistant position was to be authorized as of July 1, 1999, but she testified that it "would not have been all right for him to tell Mr. Gullet that he would be hired into that position."

This then is the crux of it. Acosta seems to have led Gullet to believe he had authority to give him long-term rights to the management assistant position, a position that evaded the threatened demotion, when Acosta's authority in fact only secured the position for Gullet for a period of five and one-half months. An ordinary mistake by a management employee, in the Board's view, nullified the good faith in Oakland's budget-related action because it gave Gullet a period of false hope.

"Good faith personnel action" may elude precise definition or a precise set of rules, but we must recognize it in Oakland's conduct here. Here, a regular and routine employment event was carried out in a reasonable manner with no hint of improper motive. The Board's contrary conclusion and resulting award to Gullet are vacated.

### V.

The award of temporary and permanent psychiatric disability payments is hereby vacated.

Kline, P. J., and Haerle, J., concurred.

The petition of respondent David Gullet for review by the Supreme Court was denied September 11, 2002.