[No. B157612. Second Dist., Div. Five. Nov. 21, 2002.]

NORTHROP GRUMMAN CORPORATION et al., Petitioners, v. WORKERS' COMPENSATION APPEALS BOARD and ROBERT C. GRAVES, Respondents.

**[Opinion certified for partial publication.†]**

---

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III.C.

## COUNSEL

Kegel, Tobin & Truce and E. Charles Maki for Petitioners.

No appearance for Respondents.

## OPINION

**TURNER, P. J.—**

### I. INTRODUCTION

Northrop Grumman Corporation (Northrop) and the Insurance Company of the State of Pennsylvania seek review of the findings and award and the order denying reconsideration in a case brought by Robert C. Graves before the Workers' Compensation Appeals Board (the board). We issued a writ of review. Upon review, based on the entire record, we conclude the workers' compensation judge's finding—that Mr. Graves sustained compensable industrial injury because of an investigation conducted in bad faith by Northrop into racial discrimination allegations—is not supported to by substantial evidence. (Labor Code,[1] § 3208.3, subd. (h).) We remand the matter to the board for further consideration consistent with this opinion.

### II. THE FACTS

#### A. *Background*

The current writ proceeding arises out of allegations Mr. Graves engaged in racial discrimination during training of Northrop employees and an ensuing investigation. Mr. Graves, a Caucasian man, was employed off and on as a tooling inspector for Northrop between 1981 and March 1999. In 1998, Mr. Graves was training employees at a Northrop facility. The employees were learning to take aircraft measurements with certain equipment. Mr. Graves and Pat McCrary evaluated the trainees for accuracy in accordance with company guidelines. Mr. Graves's duty was to ensure that a

---

[1] All further statutory references are to the Labor Code except where otherwise noted.

trainee's measurements were properly aligned and recorded within acceptable tolerances. Mr. Graves would then certify that the trainee's measurements were accurately reported. Northrop required that accurate records be kept regarding the training.

Leon Johnson, an African-American man, became Mr. Graves's supervisor in late 1997. Mr. Graves testified he had no problems on the job before March 1998. However, in April 1998, Mr. Graves was investigated following accusations he had discriminated against an African-American employee, Harold Lowe. It was further alleged Mr. Graves gave preferential treatment to a Caucasian employee, Mike Nooner.

B.  *The Investigation Report*

Several of the documents that were in evidence used company and technical jargon to describe the events giving rise to Mr. Lowe's racial discrimination complaint and the ensuing investigation. We will avoid the use of such jargon except when quoting from Northrop documents. In an undated investigation report, employee relations representative Tom Cushard recounted that Annette Schroeder had accused Mr. Graves of treating Mr. Lowe, an African-American man, "more harshly" than other employees. Ms. Schroeder, a Northrop employee, made the racial discrimination allegation in a March 22, 1998, written statement. Ms. Schroeder also said Mr. Graves spoke to Mr. Lowe "in a demeaning manner." A Northrop report related: "Ms. Schroeder said she had commented to Mr. Lowe that he didn't have to take that from anyone[.] . . . Mr. Lowe told her, yes he did because he needed Mr. Graves to [approve] his work and he didn't want any trouble from him."

Two supervisors, Benny Heredia and Joe Wise, were notified of Ms. Schroeder's written allegation and spoke to Mr. Lowe. Mr. Lowe confirmed that he felt he was being treated more severely than his coworkers and believed it was racially motivated. Mr. Heredia and Mr. Wise then contacted Mr. Cushard in employee relations "for assistance." Mr. Lowe was then interviewed by an employee relations representative. A Northrop report related Mr. Lowe stated, "[H]e felt Mr. Graves had been treating him differently than the other [trainees] and that he believed it must be because of his race as he could not determine any other reason." Mr. Lowe raised the following concerns: Mr. Graves was giving favors to some trainees while making Mr. Lowe take measurements more accurately than others; in contrast to other trainees, Mr. Lowe was given no room for error; Mr. Graves would approve measurements made by other trainees without checking the

work; Mr. Graves delayed responding to Mr. Lowe's requests to approve measurements; this resulted in Mr. Lowe having fewer approved measurements; and the delay increased the probability that Mr. Lowe's equipment would be jarred, affecting the accuracy of his measurements. When the trainees achieved a particular level of accuracy in their measurements, they would receive a special job classification and a 50-cent-per-hour salary bonus.

Mr. Cushard then advised Mr. Johnson, Mr. Graves's supervisor, of the allegations of racially motivated disparate treatment of Mr. Lowe during the training and measurement approval process. Mr. Cushard and Mr. Johnson agreed to undertake a joint management-employee relations investigation. Mr. Johnson obtained and compared all of the trainees' certification sheets. Analysis of the certification sheets and computer data showed: Mr. Graves approved measurements by two employees, Leon Robinson and Mr. Nooner; Mr. Nooner's measurements had been copied from Mr. Robinson's data; Mr. Lowe was the only trainee with a particular negative notation; and Mr. Graves had disapproved of an inordinate number of Mr. Lowe's measurements.

As part of the racial discrimination investigation, interviews were also conducted with other trainees. These interviews revealed Mr. Graves allowed trainees to check each others' work. When the trainees checked each others' measurements, Mr. Graves would give his approval without verifying the accuracy of the work. Mr. Nooner was interviewed. Mr. Nooner admitting losing his certification list. Mr. Nooner recreated the certification list with Mr. Graves's agreement to approve it. Mr. Nooner believed Mr. Graves was "particularly hard on" Mr. Lowe. One trainee, Don Austin, confirmed that he had checked other trainees' work. Mr. Austin confirmed that Mr. Graves had then approved the trainees' work without personally checking its correctness.

Mr. Lowe, one of the two persons who initiated the racial discrimination complaint about Mr. Graves, was interviewed. A Northrop employee relations report stated, "Mr. Graves was 'unavailable' during a long period of time on the weekends [and Mr. Lowe] believed that Mr. Graves would go to his car in the parking lot and sleep for an hour or two." A review of Mr. Graves's "badge scan" showed: "[Mr. Graves] failed to scan out on all but one occasion when he worked a weekend day. On the occasion he did scan out, there was a discrepancy of 2 [hours] and 25 [minutes] from the time he scanned out to the time he badged back in [on February 21, 1998]."

Mr. Cushard, the employee relations representative, then met with Mr. Graves regarding the foregoing allegations. Mr. Graves admitted: certifying

as accurate Mr. Nooner's recreated certification sheet; Mr. Austin and Mr. Robinson were permitted to inspect the work of other trainees; and Mr. Graves approved those measurements without personally inspecting the work. Mr. Graves denied sleeping in his car on weekends although he could not account for the time off-site on February 21, 1998. He also said he was unaware of the requirement that he scan out on weekends. Mr. Graves denied treating Mr. Lowe differently than other trainees. Finally, Mr. Graves denied not promptly responding to Mr. Lowe's telephone calls.

Mr. Cushard reviewed the results of the investigation with others. It was determined that Mr. Graves would be disciplined as follows: "Robert Graves was issued a Final Warning Notice and given a 3 day disciplinary suspension for gross negligence in the performance of his duties as well as for causing discord within the workplace by treating employees in a different manner and with different requirements. Mr. Graves was found to have used his [quality assurance] stamp in a manner inconsistent with stamp policy and procedures by stamping work that he did not inspect and assisting in the re-creation of a document that was inaccurate and would be to the employee's benefit. Additionally, he failed to uphold the special trust placed on a [quality assurance] inspector to ensure work is performed accurately and documented correctly. The concern about failing to scan out was mentioned as well." The investigation report closed with the following comment regarding the racial discrimination allegation: "Pauline Eisenberg was consulted throughout the investigation and findings due to the allegation of racial discrimination. It was determined and agreed that it could not be determined that Mr. Lowe's disparate treatment was the result of his race, but that the disparate treatment was apparent and that the company should take the appropriate action which would be the same, regardless of whether it was due to race, or some other basis."

## C.   The Final Warning Notice

A final warning notice was issued to Mr. Graves on April 22, 1998. It stated in part: "This FINAL WARNING NOTICE is being issued because of the grossly negligent manner in which you performed your duties as a Quality Inspector. Specifically, you stamped off work that you did not inspect and stamped off a 'reconstructed' work document that was inaccurate. Additionally, you failed to perform your inspection duties in a consistent manner, causing discord, by being overly critical of one technician's work and failing to give the same 'allowances' to him that you gave to others. This type of performance is unacceptable and in violation of [Northrop standards of conduct]. [¶] Another area of concern discovered in

the investigation was your failure to scan your badge through the outbound readers when you left the site on the weekend days that you work." The notice outlined a "corrective action plan" that Mr. Graves was required to satisfactorily complete or face further disciplinary action.

### D.  *Mr. Graves's Testimony*

Mr. Graves testified he did not have any problems on the job until April 1998, when he was accused of racial discrimination. He had been evaluated on an annual basis, and always rated outstanding. The workers' compensation judge's evidence summary states, "[B]efore March . . . 1998 . . . [Mr. Graves] received some less-than-outstanding marks, but he was never marked down until the end of 1998 by Mr. Johnson." Following the personnel action, Mr. Johnson did not want to talk to Mr. Graves. As noted previously, Mr. Johnson was Mr. Graves's supervisor. The workers' compensation judge's evidence summary states: "[Mr. Graves] was called in by Mr. Johnson in April 1998 regarding the employee relations problem. Afterwards, he did not have any meetings with Mr. Johnson. Mr. Johnson in fact avoided him. If he needed instructions, he would call him, but they were short communications." The workers' compensation judge's evidence summary relates, "He would be told by coworkers that Mr. Johnson would not see him that day because he had his hands full." In addition, the evidence summary notes, "Mr. Johnson would not give him information regarding procedures . . . ." Moreover, in December 1998, Mr. Johnson lowered Mr. Graves's performance evaluation ratings in the areas of quality and quantity of work, dependability, and cooperation. Mr. Johnson also called Mr. Graves to meetings that involved irrelevant issues. Mr. Graves should have but did not receive a plaque for his attendance in 1998. At another point Mr. Graves testified, "[T]he guards at the plant would be staring at photos of [me] and [my] coworker."

### E.  *Mr. Cushard's Testimony*

Mr. Cushard testified Mr. Graves was "charged" with: "allowing a non-qualified inspector to inspect and then [approve work] as if [Mr. Graves had] inspected himself, but he wouldn't do this with Mr. Lowe"; "working with another employee to falsify [measurements] concerning another trainee"; and "finding more problems with Mr. Lowe's work than with the other trainees." Further, Mr. Cushard testified Mr. Graves "did admit that he [approved] documents for an inspection he had not actually conducted" and "did acknowledge a violation of the company's practice and procedures." Mr. Cushard recommended disciplinary action in the form of a final warning

notice and a three-day suspension be taken; this was because Mr. Graves's conduct was considered a major violation. The only alternative would have been to terminate Mr. Graves. According to Mr. Cushard, Mr. Graves's "disparate treatment of employees and the appearance of not following clock-in and clock-out procedures" also factored in to the discipline recommendation. But the disciplinary action was based only on the falsification of documents and the finding that Mr. Graves had treated Mr. Lowe in a "disparate manner." Mr. Cushard testified he was unable to state whether the disparate treatment "was based on race or ethnicity."

Mr. Cushard denied ever threatening Mr. Graves with termination or the loss of his benefits. Mr. Cushard denied ever accusing Mr. Graves of being a racist. While conducting the investigation, Mr. Cushard did not perceive any animosity on the part of Mr. Johnson toward Mr. Graves. Mr. Cushard had no awareness of Mr. Graves being harassed by Mr. Johnson. Mr. Graves never discussed having any problem with Mr. Johnson. The workers' compensation judge's evidence summary states in relation to Mr. Cushard's testimony, "He did tell [Mr. Graves] he felt it was a major violation that he committed and he faced either a final warning notice and suspension or a termination." According to the summary of testimony, Mr. Cushard further testified: "He did review certification sheets concerning Mr. Lowe, and his work was not done properly. He would state therefore if the work was not done properly, [Mr. Graves] did act correctly in not signing off [o]n Mr. Lowe's work."

Mr. Cushard testified the racial discrimination charge was never substantiated. Mr. Cushard investigated the allegation, but found no evidence of racial discrimination by Mr. Graves. Mr. Graves received a three-day suspension, however, because his offenses were "major" as defined in the employee handbook. Mr. Graves then filed a grievance. The suspension was subsequently reversed by Mr. Cushard's and Mr. Graves's manager.

Mr. Cushard said it was true that in 1998 and 1999 the facility where Mr. Graves was conducting the training was being downsized. Mr. Cushard explained Northrop's layoff policy as follows: "[F]irst, there is a determination of the classification to be reduced and the numbers to be reduced. Second[], the human resources department applies the seniority process. Each employee is given the opportunity to bump to the same or lower classification or a previously held position. It is not done by the age of the individual."

F.   *Mr. Johnson's Testimony*

As noted previously, Mr. Johnson was Mr. Graves's supervisor. Mr. Johnson approached Mr. Graves about the racial discrimination allegation.

Mr. Graves became "angry and upset." Mr. Johnson further testified that prior to March 1998, Mr. Graves was "a very good worker." Prior to June 1998, Mr. Johnson had rated Mr. Graves outstanding on his performance evaluations. He subsequently lowered Mr. Graves's rating in certain respects. But the performance evaluation "was grieved and readjusted."

Following the disciplinary action, Mr. Johnson noticed changes in Mr. Graves's behavior. Mr. Johnson described Mr. Graves's reaction to the discipline imposed as follows: "[He] became antisocial and distant from the other employees and [Mr. Johnson]. He was also hard to approach and communicate with." Mr. Graves was never told his job was in jeopardy. In fact, Mr. Graves's job was *not* in jeopardy. Mr. Johnson denied that he was trying to avoid Mr. Graves. Mr. Johnson did not have any animosity toward Mr. Graves. Mr. Johnson denied harassing Mr. Graves.

Mr. Johnson testified to a change in overtime policy following, but unrelated to, Mr. Graves's suspension. The change came about after Mr. Johnson learned Mr. Graves was working overtime on weekends. This was occurring even though Mr. Graves's department did not need overtime staffing. Mr. Johnson instructed Mr. Graves and his comanager, Mr. McCrary, that henceforth overtime had to be cleared with "management."

### G. Dr. John Beck's Psychiatric Treatment Reports

Dr. Beck, a psychiatrist, prepared two psychiatric treatment reports. The first was dated November 2, 2000. Dr. Beck diagnosed Mr. Graves as suffering from a major depressive disorder in partial remission. Dr. Beck found there was a direct relationship between work exposure and disability, stating: "[a]bsent the harassment and the age discrimination from which the applicant suffered there would have been no psychiatric work function impairment"; and "[a]ge discrimination is a clear violation [o]f labor laws as is allowance of a hostile work environment where harassment may be practiced." Dr. Beck concluded "[a]ctual events of employment" were responsible for "100% of the total causation from all sources contributing to the current psychiatric injury and disability." In his February 26, 2001, report, Dr. Beck reiterated the conclusions stated in his November 2, 2000, report. Dr. Beck further noted Mr. Graves's condition had remained the same since November 2000. At the same time, however, Dr. Beck rated Mr. Graves's psychiatric work function impairment higher overall.

### H. Dr. Stanley L. Goodman's Medical-legal Psychiatric Evaluation Report

Mr. Graves was evaluated by Dr. Goodman, a psychiatrist. Dr. Goodman concluded that: "[Mr. Graves] was falsely charged as a racist, [but] was

eventually absolved of these insinuations. . . . [¶] The patient has significant psychosocial stressors; that is, the cumulative traumatic incidents which he perceived at work." Dr. Goodman also found, "[T]he industrial stressors of job harassment and age discrimination did produce an industrially-related psychiatric injury." In addition, Dr. Goodman concluded that 100 percent of the disability was "apportioned to industrial causation." Dr. Goodman summarized the facts as related by Mr. Graves as follows: "[Mr. Graves] was falsely charged as a racist, was eventually absolved of these insinuations, but continued to be harassed and suffered age discrimination until he was eventually asked to retire. . . . [¶] There was a hostile work environment created by his manager, Leon Johnson, and the [employee relations] representative who interrogated him, Tom Cushard."

In conversations with Dr. Goodman, Mr. Graves described the crucial meeting with Mr. Cushard as follows: "[Employee relations] scrutinized this case very closely. Mr. Graves was questioned and yelled at by an [employee relations] representative named Tom Cushard. The patient reports that Mr. Cushard called him a racist and said he would get [him] fired. The patient says he felt like he had been talking to Hitler." Dr. Goodman wrote: "[Mr. Graves] feels it was not coincidence that his 65th birthday took place at around the same time as this investigation. He ha[d] also overheard management saying things in meetings, such as 'Is there any other way we can get rid of the old-timers?'" Mr. Graves noted he had: not had any problems at work; no meetings with employee relations; received commendations for his work and attendance through the years; and things changed only as he neared retirement age.

Dr. Goodman further reported: "Although the racial discrimination charge was never substantiated, Mr. Graves feels that many black employees are suspicious of him, which permeates the work environment. The patient says he felt as though everyone wanted him to quit. He considered doing so, but could not for medical and financial reasons. . . . Also, Mr. Graves is near retirement age, so it would not make sense to walk away early. [¶] Mr. Graves claims that Mr. Johnson has been dissecting his work ever since the incident in 1998. However, if Mr. Graves needed to speak with Mr. Johnson, he would never be available for conversation. Fortunately, Mr. Johnson does not know much about tooling, so he was not able to pursue any further charges against Mr. Graves. Mr. Johnson did make the job unbearable, though, by cutting overtime, making threats, etc. [¶] Just before he retired, Mr. Graves describes an incident in which he confronted Mr. Johnson about the overtime issue and subsequently experienced severe shortness of breath, much like an asthma attack. . . . [¶] Mr. Graves retired on April 30, 1999.

He says he was forced to retire on this date by [employee relations]. If he had not been so stressed out over the prior year, the patient may not have retired yet. Mr. Graves continues to suffer the stress-related symptomatology. . . ."

### I. Dr. David Appleton's Psychiatric Evaluation

Dr. Appleton, a psychologist, evaluated Mr. Graves on Northrop's behalf. Dr. Appelton concluded: "[Mr.] Graves developed a [depressive disorder] as a result of a personnel action at work, specifically his suspension and written reprimand for the misuse of his inspector's stamp. There were also allegations that Mr. Graves was involved in racial discrimination. [¶] . . . [¶] As long as the personnel action in question was carried out in a lawful, good faith, and non-discriminatory manner (and while the patient alleges age discrimination with respect to this, he admits he misused his stamp), then the Depressive Disorder would not represent a compensable psychological injury under current Workers' Compensation law."

### J. The Workers' Compensation Judge's Findings and Award

The workers' compensation judge found Mr. Graves had sustained a psychiatric injury arising out of and occurring in the course of his employment. The workers' compensation judge relied on Mr. Graves's testimony and the medical reports of Dr. Goodman, dated June 21, 1999, and Dr. Beck, dated November 2, 2000, and February 26, 2001. The workers' compensation judge further found: the injury caused permanent disability of 20 percent equivalent to 70.50 weeks payable at $160 per week for a total sum of $11,280; further medical treatment was required; and Mr. Graves's injury resulted from "a *false* accusation of racial prejudice by the employer, and harassment by [Mr.] Johnson . . . after the charge of racial prejudice could not be proven." (Original italics.) The workers' compensation judge concluded "No lawful good faith personnel action constituted a substantial cause of [Mr. Graves's] injury."

### K. The Reconsideration Order

Northrop and its insurer sought reconsideration. The workers' compensation judge recommended that the reconsideration petition be denied. The workers' compensation judge noted: Mr. Graves was "a very credible witness"; Mr. Graves had no problems on the job until he was accused of racial discrimination against an employee; that charge was never substantiated; "[t]he allegation of racial discrimination against [Mr. Graves] was not made in good faith; it was never proven since there was a lack of evidence to support it"; Mr. Graves was never disciplined as a result of the racial

discrimination charge; the only disciplinary action taken against Mr. Graves was for falsification of company documents; following the charge, Mr. Johnson, an African-American, "would not talk to [Mr. Graves] anymore, and then downgraded his performance evaluation"; Mr. Graves's psychiatric injury was caused by the "baseless" charge of racial discrimination and the investigation that followed; it was not the result of a " 'good faith personnel action' "; it was the result of "a *completely unsubstantiated charge* of racial discrimination"; Mr. Graves was 66 years old at the time, "and there is evidence . . . that [he] was being forced to retire, possibly because of his age"; the investigation was "*not*" in good faith and it "singled [Mr. Graves] out in order to have him leave the company." (Original italics.) The workers' compensation judge noted that Dr. Beck had diagnosed depression as a result of Mr. Graves's perception of harassment and age discrimination. Dr. Appleton, who examined Mr. Graves for Northrop, also made a depression diagnosis but concluded it was the result of a lawful, good faith, and nondiscriminatory personnel action. The board adopted the workers' compensation judge's report and denied reconsideration.

III. Discussion

A. *Standard Of Review*

▮ Our obligations begin with the following basic proposition, "The question whether an injury is compensable is primarily one for the [board] to determine . . . ." (65 Cal.Jur.3d (rev.) pt. 1 (1998) Work Injury Compensation, § 204, p. 274 citing, e.g., *Pac. Emp. Ins. Co. v. Ind. Acc. Comm.* (1942) 19 Cal.2d 622, 628 [122 P.2d 570, 141 A.L.R. 798], and *Southern S. Co. v. Industrial Acc. Com.* (1916) 173 Cal. 678, 679 [160 P. 884].) Our review is limited, and is governed by the explicit language of section 5952. (*LeVesque v. Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627, 637 [83 Cal.Rptr. 208, 463 P.2d 432]; *City of Oakland v. Workers' Comp. Appeals Bd.* (2002) 99 Cal.App.4th 261, 264 [120 Cal.Rptr.2d 873].) Section 5952 states in relevant part: "The review by the court shall not be extended further than to determine, based upon the entire record . . . , whether: [¶] . . . [¶] (d) The order, decision, or award was not supported by substantial evidence. [¶] (e) If findings of fact are made, such findings of fact support the order, decision, or award under review. [¶] Nothing in this section shall permit the court to hold a trial de novo, to take evidence, or to exercise its independent judgment on the evidence." We accord the following weight to the board's factual findings, "The findings and conclusions of the appeals board on questions of fact are conclusive and final and are not subject to review." (§ 5953; *LeVesque v. Workmen's Comp. App. Bd., supra,* 1 Cal.3d at p. 637,

fn. 19.) As the Supreme Court has held: "In reviewing the evidence our legislative mandate and sole obligation under section 5952 is to review the entire record to determine whether the board's conclusion was supported by substantial evidence. [Citations.]" (*LeVesque v. Workmen's Comp. App. Bd., supra,* 1 Cal.3d at p. 637; accord, *Lamb v. Workmen's Comp. Appeals Bd.* (1974) 11 Cal.3d 274, 280-281 [113 Cal.Rptr. 162, 520 P.2d 978]; *Dimmig v. Workmen's Comp. Appeals Bd.* (1972) 6 Cal.3d 860, 864 [101 Cal.Rptr. 105, 495 P.2d 433]; *Garza v. Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 312, 317 [90 Cal.Rptr. 355, 475 P.2d 451]; 65 Cal.Jur.3d pt. 2 (2002 supp.) Work Injury Compensation, § 784, pp. 29-30.) Further, the Supreme Court has held, "The reviewing court must consider the entire record (. . . § 5952) and may not isolate only the evidence which supports the board's findings [citation] and thus disregard relevant evidence in the record. [Citation.]" (*LeVesque v. Workmen's Comp. App. Bd., supra,* 1 Cal.3d at pp. 638-639, fn. 22; accord, *Lamb v. Workmen's Comp. Appeals Bd., supra,* 11 Cal.3d at pp. 280-281; *Garza v. Workmen's Comp. App. Bd., supra,* 3 Cal.3d at p. 317.)

### B. *The Decision Was Not Supported by Substantial Evidence*

The right to compensation for work-related psychiatric injury is described in section 3208.3, subdivision (a) as follows, "A psychiatric injury shall be compensable if it is a mental disorder which causes disability or need for medical treatment, and it is diagnosed pursuant to procedures promulgated under paragraph (4) of subdivision (j) of Section 139.2 or, until these procedures are promulgated, it is diagnosed using the terminology and criteria of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Third Edition-Revised, or the terminology and diagnostic criteria of other psychiatric diagnostic manuals generally approved and accepted nationally by practitioners in the field of psychiatric medicine." (See *Livitsanos v. Superior Court* (1992) 2 Cal.4th 744, 753 [7 Cal.Rptr.2d 808, 828 P.2d 1195]; *Hansen v. Workers' Compensation Appeals Bd.* (1993) 18 Cal.App.4th 1179, 1183 [23 Cal.Rptr.2d 30].) The relevant exception in this case to the compensation right in the case of psychiatric injury is set forth in section 3208.3, subdivision (h) which states: "No compensation under this division shall be paid by an employer for a psychiatric injury if the injury was substantially caused by a lawful, nondiscriminatory, good faith personnel action. The burden of proof shall rest with the party asserting the issue." The term "substantially caused" in section 3208.3, subdivision (h) is defined in section 3208.3, subdivision (b)(3) as follows, "For the purposes of this section, 'substantial cause' means at least 35 to 40 percent of the causation from all sources combined."

Section 3208.3 does not define "lawful, nondiscriminatory, good faith personnel action." However, as the Court of Appeal for the First Appellate

District, Division Two, held in *City of Oakland v. Workers' Comp. Appeals Bd., supra,* 99 Cal.App.4th at pages 266-267, the words at issue have a meaning similar to the language construed in *Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93, 109 [69 Cal.Rptr.2d 900, 948 P.2d 412]. Our First District colleagues in *City of Oakland* described the *Cotran* holding as follows: "In *Cotran,* the employer fired a manager after conducting an investigation into allegations he sexually harassed two employees. When the manager sued for unlawful termination—violating an implied promise not to terminate without good cause—the trial court instructed the jury that the employer was required to prove the sexual harassment took place. (*Cotran, supra,* 17 Cal.4th at pp. 96-99.) *Cotran* concluded that the question was not whether sexual harassment in fact took place, but whether 'at the time the decision to terminate his employment was made, defendants, acting in good faith and following an investigation that was appropriate under the circumstances, had reasonable grounds for believing plaintiff had done so.' (*Id.* at p. 109.) [¶] *Cotran* explained that the jury's role was to 'assess the *objective reasonableness* of the employer's factual determination of misconduct.' (*Cotran, supra,* 17 Cal.4th at p. 103.) In complicated analysis we need not repeat here, the court described this as the '*objective* good faith standard' and explained that 'coupling "good faith" with "objectivity" is intended to place the trier of fact in the position of the "reasonable employer" in deciding whether the defendant in a wrongful termination suit acted responsibly and in conformity with prevailing social norms in deciding to terminate an employee for misconduct.' The proper inquiry for the jury is: ' "Was the factual basis on which the employer concluded a dischargeable act had been committed reached honestly, after an appropriate investigation and for reasons that are not arbitrary or pretextual?" ' (*Id.* at pp. 106-107 & fn. 3.)" (*City of Oakland v. Workers' Comp. Appeals Bd., supra,* 99 Cal.App.4th at p. 266, original italics.) ■ In *City of Oakland,* the Court of Appeal concluded "[T]he Legislature's 'good faith personnel action' exemption is meant to furnish an employer a degree of freedom in making its regular and routine personnel decisions (such as discipline, work evaluation, transfer, demotion, layoff, or termination). If a regular and routine personnel decision is made and carried out with subjective good faith and the employer's conduct meets the objective reasonableness standard, section 3208.3's exemption applies." (*City of Oakland v. Workers' Comp. Appeals Bd., supra,* 99 Cal.App.4th at p. 267, fn. omitted.) The Court of Appeal further agreed with the board's interpretation of the good faith standard in *Larch v. Contra Costa County* (1998) 63 Cal.Comp.Cases 831. The Court of Appeal stated: "[W]e agree with the Board's importation of the objective good faith standard from *Cotran.* . . . *Larch* quoted extensively from *Cotran,* borrowing the 'objective good faith standard' and explaining in its own words that '[a]ny analysis

of the good faith issue . . . must look at the totality of the circumstances, not a rigid standard, in determining whether the action was taken in good faith. To be in good faith, the personnel action must be done in a manner that is lacking outrageous conduct, is honest and with a sincere purpose, is without an intent to mislead, deceive, or defraud, and is without collusion or unlawful design.' (*Larch v. Contra Costa County, supra,* at pp. 836-837.)" (*City of Oakland v. Workers' Comp. Appeals Bd., supra,* 99 Cal.App.4th at p. 267.) We agree with the well-stated legal analysis in *City of Oakland.*

■ In this case, the workers' compensation judge found that what occurred was not a "lawful, nondiscriminatory, good faith personnel action" within the meaning of section 3208.3, subdivision (h). This finding is not supported by substantial evidence. To begin with, this investigation was mandated by law. Racial discrimination in employment is prohibited by both state and federal law. (Gov. Code, § 12940, subd. (a); 42 U.S.C. § 2000e et seq.) The right to hold employment free of discrimination on the basis of race, among other protected classifications, is a civil right. (Gov. Code, § 12921, subd. (a); *Fiol v. Doellstedt* (1996) 50 Cal.App.4th 1318, 1323-1324 [58 Cal.Rptr.2d 308]; *Matthews v. Superior Court* (1995) 34 Cal.App.4th 598, 602 [40 Cal.Rptr.2d 350].) The prohibition against workplace racial discrimination is a fundamental public policy. (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 129 [87 Cal.Rptr.2d 132, 980 P.2d 846] (plur. opn. of George, C. J.); *Brown v. Superior Court* (1984) 37 Cal.3d 477, 485 [208 Cal.Rptr. 724, 691 P.2d 272]; Gov. Code, § 12920). The express purpose of the California Fair Employment and Housing Act is "to provide effective remedies that will eliminate [such] discriminatory practices." (Gov. Code, § 12920; *Konig v. Fair Employment & Housing Com.* (2002) 28 Cal.4th 743, 747 [123 Cal.Rptr.2d 1, 50 P.3d 718]; *Matthews v. Superior Court, supra,* 34 Cal.App.4th at p. 602.) Title 2 of the California Code of Regulations, section 7286.3 states, "The public policy of the State of California is to protect and safeguard the civil rights of all individuals to seek, have access to, obtain, and hold employment without discrimination because of race . . . ." Moreover, employers must "take all reasonable steps necessary to prevent discrimination and harassment from occurring." (Gov. Code, § 12940, subd. (k); *Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1146 [74 Cal.Rptr.2d 510] [sexual harassment]; *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 286 [73 Cal.Rptr.2d 596] [race discrimination].) The employer's duty to prevent harassment and discrimination is affirmative and mandatory. (Gov. Code, § 12940, subds. (j)(1) & (k).) Prompt investigation of a discrimination claim is a necessary step by which an employer meets its obligation to ensure a discrimination-free work environment. (See, e.g., *Adler v. Wal-Mart Stores, Inc.* (10th Cir.

1998) 144 F.3d 664, 676; *Ellison v. Brady* (9th Cir. 1991) 924 F.2d 872, 881-882; *Jones v. Los Angeles Community College Dist.* (1988) 198 Cal.App.3d 794, 810-811 [244 Cal.Rptr. 37].)

In the present case, Mr. Graves's psychiatric injury was caused by an *accusation* and investigation of what the workers' compensation judge concluded was a baseless, unsubstantiated, charge of racial discrimination. In his opinion on decision, the workers' compensation judge found: "[Mr. Graves] suffered this injury from a *false* accusation of racial prejudice by the employer, and the harassment by Leon Johnson, [Mr. Graves's] supervisor, after the charge of racial prejudice could not be proven. None of the actual events of employment were lawful, good faith personnel actions constituting a substantial cause of [Mr. Graves's] injury." (Original italics.) The workers' compensation judge's recommendation on reconsideration noted: "The allegation of racial discrimination against [Mr. Graves] was not made in good faith; it was never proven since there was a lack of evidence to support it"; Mr. Graves's "emotional complaints" began after the "baseless *charge* of racial discrimination was made against him" (original italics); Mr. Graves's psychiatric injury was caused by "a *baseless charge* of racial discrimination and the investigation that followed" (italics added); Mr. Graves's psychiatric injury was "the result of a *completely unsubstantiated charge* of racial discrimination" (original italics); and Mr. Graves's psychiatric injury was "the result of an investigation on a charge of racial discrimination *not* made in good faith." (Original italics.)

However, as discussed above, an employer, faced with an accusation made by a coworker that a supervisor has engaged in racial discrimination against a subordinate, has a legal obligation to investigate that claim. Here, the accusation was made by a coworker, Ms. Schroeder, of the alleged target, Mr. Lowe. Upon questioning, Mr. Lowe stated he believed he was being discriminated against because of his race. Mr. Lowe cited specific plausible examples of racially discriminatory conduct by Mr. Graves. That Northrop was later, after investigating the racial discrimination claim, unable to substantiate the accusation did not remove the investigation from the realm of good faith employer personnel actions. Mr. Graves, a veteran employee and supervisor with no disciplinary record, was accused by an employee of racially discriminating against a trainee. Mr. Graves's unblemished record notwithstanding, Northrop had a legal obligation to investigate the charge made by a coworker and corroborated by the alleged victim. Northrop did not have the option of doing nothing. The investigation revealed Mr. Graves had in fact treated an African-American trainee disparately. But the Northrop investigation found no evidence the disparate treatment was racially motivated. There was no evidence of an arbitrary or

unlawful motive for Northrop's investigation. There was no evidence of an intent to mislead, deceive, or defraud or of collusion or unlawful design by a Northrop employee. In fact, the investigation disclosed that Mr. Graves, in training employees for work in a classified project, allowed trainees to evaluate each others' work, in violation of Northrop's policies. Further, a trainee had simply copied another's work and had been allowed to do so by Mr. Graves. Suffice to note, investigating such misconduct by a supervisor employed by a defense contractor is altogether fitting and proper. The lives of American military personnel and those who serve with our coalition partners should not be endangered by inadequate training by a supervisor employed by a major defense contractor or by falsification of documents.

The award in this case rests on the workers' compensation judge's factually unsupported conclusion Northrop's personnel action was not undertaken in good faith. The extent to which the workers' compensation judge believed Mr. Graves's psychiatric injury arose from subsequent purported harassment at the hands of Mr. Johnson is unclear. The workers' compensation judge made only passing reference to harassment by Mr. Johnson. As noted above, Mr. Graves's psychiatric injury was not compensable if it was substantially caused, i.e., "at least 35 to 40 percent of the causation from all sources combined" (§ 3208.3, subd. (b)(3)) by Northrop's nondiscriminatory, good faith personnel action. (§ 3208.3, subd. (h).) On the record before us, we cannot say whether Northrop's lawful, nondiscriminatory, good faith personnel action was less than 35 percent of the causation from all sources combined. Accordingly, we remand this matter to the board for further consideration consistent with our decision.

C.   *Section 5908.5\**

### IV.   DISPOSITION

The workers' compensation award in favor of Robert C. Graves is reversed. The matter is remanded for further consideration consistent with the views expressed in this opinion.

Grignon, J., and Armstrong, J., concurred.

---

*See footnote, *ante*, page 1021.