Filed 12/30/20; Certified for Publication 1/28/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| GEORGE CHOOCHAGI, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> BARRACUDA NETWORKS, INC., <br><br> Defendant and Respondent. | H045194 <br> (Santa Clara County <br> Super. Ct. No. 14-CV-270651) |

Appellant George Choochagi sued his former employer, Respondent Barracuda Networks, Inc. (Barracuda), alleging causes of action under the Fair Employment and Housing Act (FEHA), the California Family Rights Act (CFRA), and wrongful termination in violation of public policy. The trial court granted summary adjudication on most of Choochagi's claims. The case proceeded to jury trial on the remaining claims, and the jury returned a defense verdict for Barracuda.

Choochagi appeals, arguing that the trial court erred by granting summary adjudication. He also argues that judicial error in the course of the jury trial requires reversal of the jury verdict, and that the trial court abused its discretion when it calendared his motion for new trial beyond the statutory deadline to hear the motion. For reasons we explain below, we find no reversible error and affirm the judgment.

# I. BACKGROUND

## A. Choochagi's Allegations

Choochagi alleged the following in his complaint: In March 2012, Barracuda hired Choochagi as a Technical Support Manager. During his initial training period, Choochagi reported to Hossein Ghazizadeh. In July 2012, Choochagi was transferred to the position of Sales Engineering Manager, and began reporting to Michael Hughes.

In May 2013, Choochagi reported to Human Resources (HR) that Ghazizadeh made inappropriate sexual comments to Choochagi about having sex with women at the office, and about Choochagi not being " 'man enough' " for his position. Choochagi was also told he was not part of the " 'boys club' " and "that there was a dark cloud over his head . . . ." Choochagi contended that he was terminated based on his complaint about Ghazizadeh's conduct.

In January 2014, Choochagi began experiencing severe migraine headaches and eye irritation, which required him to seek medical treatment. He notified Scott Brooks, Director of Sales Engineering and one of his supervisors, that he needed to take time off from work. Choochagi was permitted to take that time off as requested. Two weeks later he met with Brooks in person and raised the possibility of taking more time off from work; Brooks "seemed irritated . . . and even stated to him 'how are we going to take care of everything when you are out?' " Rather than discuss what accommodations might be necessary or Choochagi's right to medical leave, Barracuda moved to terminate or force Choochagi to quit.

In February 2014, Choochagi met with Brooks, who told him he was not part of the " 'boys club' " and asked him, " 'do you really want to stay with Barracuda?' " Brooks told Choochagi he "must decide whether he wants to be fired or gracefully quit." Choochagi refused to resign, maintaining that he had "performed well" and "was often praised for his performance." Choochagi was later terminated.

2

## B. Barracuda's Response

### 1. Choochagi Was Fired Because Of Performance Issues

Barracuda moved for summary judgment, or in the alternative, summary adjudication of the issues. In the motion, Barracuda characterized Choochagi as a "poorly performing employee" who did "subpar work" at Barracuda, and so constructed "baseless discrimination claims" after he was terminated.

Choochagi was initially hired as a Technical Support Manager, working under Ghazizadeh. A few months later, he was transferred to the position of Sales Engineering Manager. He initially reported to Hughes, who observed that while Choochagi "seemed to follow explicit instructions, he lacked the ability to proactively solve problems or come up with creative solutions." After a few months, Hughes asked one of his "direct reports, Glenn Esposito . . . to manage" Choochagi "in hopes that he could develop him into the kind of manager" Barracuda needed. Esposito perceived similar deficiencies in Choochagi's work performance, and did not see any tangible improvements in the six months he managed him. In June 2013, Esposito asked one of his direct reports, Brooks, to start working with Choochagi in a mentoring role. As part of this transition, Esposito "made a list of specific areas that" Choochagi "needed to improve upon." Esposito and Hughes continued to manage Choochagi.

Brooks had immediate misgivings about Choochagi, writing in an email, " '[i]n my gut, I'm not sure [Choochagi] is the right type of person to lead the team.' " Esposito responded that he agreed "100%," and recommended that Brooks "should give [Choochagi] some constructive criticism on his management style and see how he responds.' "

After some time had passed, Brooks prepared a draft performance evaluation for Choochagi, covering the year ending in February 2014. His overall impression was that Choochagi "demonstrated poor leadership skills," which was a sentiment shared by Choochagi's entire team. After Esposito reviewed the draft and discussed it with

Hughes, "they realized there had been little to no improvement on the key areas of concern," and that Choochagi was "not fulfilling his role as a proactive leader." In February 2014, Hughes and Esposito decided that in light of Choochagi's "inability to fulfil the leadership role, they would eliminate the position and terminate [him]." Brooks telephoned Choochagi a few days later and informed him that he was being terminated.

### 2. Choochagi Did Not Request, And Was Not Denied, Medical Leave

Choochagi informed Brooks he was experiencing headaches and needed to follow-up with his doctors to have an MRI to find out what was causing the headaches. Choochagi's first and only request for time off from work came by way of an email in January 2014, in which he asked for time off " 'to take care [of] [his] health.' " Choochagi took the leave as requested. Brooks followed up by email and told Choochagi to let him know if Choochagi needed anything. Other than the single email, Choochagi never requested any other time off.

### 3. Barracuda Investigated Choochagi's Complaint About Ghazizadeh

In or about mid-2013, months after Choochagi was transferred to work under Hughes and Esposito, Choochagi submitted a complaint to HR about Ghazizadeh. In response, HR contacted Ghazizadeh's supervisor, who held a meeting with Ghazizadeh to discuss the incident. Ghazizadeh denied saying anything inappropriate to Choochagi, but was "reminded . . . of Barracuda's policies and instructed . . . not to engage in any type of sexually explicit communication in the workplace." Choochagi made no further complaints during his employment, and neither Hughes, nor Esposito or Brooks, had knowledge of the complaint at the time.

## C. Summary Adjudication and Trial

Choochagi's complaint alleged claims of interference and retaliation under CFRA, wrongful termination in violation of public policy, and the following FEHA claims: disability discrimination, retaliation, gender discrimination, and failure to prevent discrimination and retaliation.

4

Barracuda moved for summary judgment, or in the alternative, summary adjudication of the issues. Choochagi filed opposition, and Barracuda filed a reply.

The trial court granted Barracuda's motion for summary adjudication as to the following causes of action: interference and retaliation under CFRA; retaliation; gender discrimination; and failure to prevent discrimination and retaliation.

The case proceeded to trial on the two remaining causes of action, disability discrimination and wrongful termination in violation of public policy. The jury returned a special verdict finding no liability on the part of Barracuda. Judgment was entered on June 5, 2017.

On July 7, 2017, Choochagi filed a notice of intent to move for a new trial. On July 17, 2017, he filed a motion for a new trial, and a hearing date of August 25, 2017 was set. The motion was heard on August 25, 2017, and it was denied because the statutory time to rule on the motion had expired. Choochagi timely appealed from the order granting summary adjudication and the order denying his motion for new trial.

## II. DISCUSSION

### A. Summary Adjudication

A party may move for summary judgment or, in the alternative, summary adjudication of specific claims. (Code Civ. Proc. § 437c, subds. (f)(1) & (2), (t)(5).) A motion for summary adjudication "proceed[s] in all procedural respects as a motion for summary judgment." (Code Civ. Proc. 437c, subd. (t)(5).) The moving party "bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if [the movant] carries [this] burden of production," the burden of production shifts to the opposing party "to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).)

In determining whether the parties have met their respective burdens, "the court must 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn

5

therefrom [citation], and must view such evidence [citations] and such inferences [citations], in the light most favorable to the opposing party." (*Aguilar*, *supra*, 25 Cal.4th at p. 843.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Id.* at p. 850, fn. omitted.)

"In reviewing a trial court's grant of summary judgment [or summary adjudication], . . . ' "[w]e take the facts from the record that was before the trial court when it ruled on that motion" ' and ' " ' "review the trial court's decision de novo . . . ." ' " ' " (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1039.)

### 1. *CFRA Claims*

"CFRA 'is intended to give employees an opportunity to take leave from work for certain personal or family medical reasons without jeopardizing job security.' " (*Bareno v. San Diego Community College Dist.* (2017) 7 Cal.App.5th 546, 558.) "The CFRA entitles eligible employees to take up to 12 weeks of unpaid medical leave during a 12–month period for certain personal or family medical conditions, including care for their children, parents, or spouses or to recover from their own serious health condition. [Citations.] CFRA's regulations provide that, for an employee to be entitled to a medical leave for her own serious health condition, the condition must cause her to be unable to work at all or unable to perform one or more of the essential functions of her position. [Citation.] An employee who takes CFRA leave is guaranteed that taking leave will not result in a loss of job security or in other adverse employment actions. [Citations.]" (*Neisendorf v. Levi Strauss & Co.* (2006) 143 Cal.App.4th 509, 516-517.)

"Violations of the CFRA generally fall into two types of claims: (1) 'interference' claims in which an employee alleges that an employer denied or interfered with her substantive rights to protected medical leave, and (2) 'retaliation' claims in which an employee alleges that she suffered an adverse employment action for exercising her right

6

to CFRA leave." (*Rogers v. County of Los Angeles* (2011) 198 Cal.App.4th 480, 487-488.)

### a. There was no triable issue of fact on the CFRA interference claim

"A CFRA interference claim ' "consists of the following elements: (1) the employee's entitlement to CFRA leave rights; and (2) the employer's interference with or denial of those rights." ' " (*Soria v. Univision Radio Los Angeles, Inc.* (2016) 5 Cal.App.5th 570, 601 (*Soria*).)

"[T]o request CFRA leave an employee 'shall provide at least verbal notice sufficient to make the employer aware that the employee needs CFRA leave, and the anticipated timing and duration of the leave. The employee need not expressly assert rights under CFRA . . . ; however, the employee must state the reason the leave is needed, such as, for example, the expected birth of a child or for medical treatment . . . . The employer should inquire further of the employee if necessary to determine whether the employee is requesting CFRA leave and to obtain necessary information concerning the leave (i.e., commencement date, expected duration, and other permissible information).' " (*Soria*, *supra*, 5 Cal.App.5th at p. 602.) "[I]n the context of leave for an employee's own serious health condition, the mere notice that an employee seeks to use sick time is insufficient to place the employer on notice that the employee seeks CFRA-qualifying leave. Leave for an employee's health condition requires a serious health condition that makes the employee unable to perform the functions of his or her position." (*Stevens v. Department of Corrections* (2003) 107 Cal.App.4th 285, 292.)

In granting summary adjudication on the CFRA interference claim, the trial court concluded that Choochagi "did not submit evidence which demonstrates that he requested additional time off due to his medical condition and was denied such leave."

Choochagi argues that there was sufficient evidence to raise a triable issue of fact as to whether he actually requested medical leave. Choochagi points to Brooks's deposition. In that deposition, Brooks stated that Choochagi "probably" only talked

7

about having headaches "twice." He also recalled that Choochagi had medication that he could take if he felt a headache coming on. Brooks told Choochagi that if there was "anything [Choochagi] needed," "to let [Brooks] know," and that Choochagi "could take whatever time he needed to figure out what was going on." Choochagi also directs us to an email he sent to Brooks, in which Choochagi wrote: "Just letting you know I need to take this Friday PTO I have to take of my health, ill fill you in more when we chat Thx." (idioms in original)

Choochagi also cites his own deposition. In it, Choochagi described getting an MRI because of migraine headaches; Brooks was aware of the headaches and the scheduled medical procedure. Choochagi explained that he did not request time off for the MRI because he "didn't need a time off"—he could go "during the lunch and g[et] it done and then come back." He also described taking "two to three days" off in January 2014 for doctor's appointments. According to Choochagi, he communicated to Brooks that he was experiencing migraine headaches, and that he might need time off. In response, Brooks "raised a concern" about who would manage Choochagi's team. Choochagi replied, "I am not taking one month off. It's not going to be a long-term, but just at least a few days so that I can take care of my health." In response, Brooks told him, "[O]kay, well, that's something we can talk about."

On this evidence, summary adjudication on Choochagi's interference claim was properly granted because he failed to present evidence that he asked for and was denied leave, and thus did not raise a triable issue of fact. Brooks recalled that Choochagi talked generally about having headaches, that the headaches could apparently be treated with medication, and that in any case Choochagi could have "anything he needed." None of this would have alerted Barracuda to the fact that Choochagi was requesting leave to take care of a serious health condition that made Choochagi unable to perform his job functions. Indeed, the report that medication could control the headaches suggested the opposite. Nor did the single email requesting PTO leave reasonably raise the possibility

8

that Choochagi needed CFRA leave. In addition, nothing Choochagi recounted in his deposition amounted to a request to take CFRA leave. In that deposition, Choochagi said he took time off for doctor's appointments. He also stated that he told Brooks he might need some time off because of migraine headaches, but then clarified that he would only need "a few days" for it, none of which suggested that Choochagi was requesting leave for a serious condition that made him unable to perform his job functions.

Choochagi asserts that he understood Brooks's statement about having a "concern" about who would manage Choochagi's team to be an effective denial of his leave request. An employee's "subjective beliefs in an employment discrimination case do not create a genuine issue of fact; nor do uncorroborated and self-serving declarations." (*King v. United Parcel Serv., Inc.* (2007) 152 Cal.App.4th 426, 433.) Apart from Choochagi's subjective interpretation of Brooks's comment, the objective evidence demonstrated that Choochagi's request for leave was vague, and Choochagi quickly clarified that he did not need an extended period of leave. Brooks did not deny the request, stating at the conclusion of the conversation that they could talk further about it. Choochagi's subjective belief does not create a triable issue of fact on the question of whether he requested and was denied CFRA leave.

Finally, Choochagi contends that Barracuda never "informed him of his right to medical leave and job protection" under the CFRA. Employers who are subject to CFRA are required to provide notice to their employees of the right to request CFRA leave. (Cal. Code Regs., tit. 2, § 11095, subd. (a).) Employers are also required to include a description of CFRA leave in their employee handbooks, and are "encouraged to give a copy of the notice" to current and new employees. (Cal. Code Regs., tit. 2, § 11095, subds. (a), (b).) Here, Barracuda submitted as evidence its Employee Handbook, which included a section describing leaves of absence and various types of leave, including CFRA leave. Barracuda also submitted evidence that Choochagi received the Employee Handbook. Choochagi did not meaningfully contradict any of this evidence. CFRA does

9

not require the employer to provide repeated notice to an employee. (Cal. Code Regs., tit. 2, § 11091, subd. (a)(1).) Thus, there was also no triable issue of fact as to whether Barracuda discharged its duty to provide notice to Choochagi of his right to request CFRA leave.

In sum, the evidence Choochagi presented was insufficient to raise a triable issue of fact as to whether Choochagi was informed of his right to CFRA leave, whether he requested CFRA leave, and whether any such request was denied. Because there was no triable issue of fact as to whether he actually requested and was denied CFRA leave, summary adjudication on Choochagi's CFRA-interference claim was appropriate.

### b. There was no triable issue of fact on the CFRA retaliation claim

The CFRA provides that "[i]t shall be an unlawful employment practice for an employer to . . . discharge . . . or discriminate against, any individual because of . . . . [¶] (1) An individual's exercise of the right to family care and medical leave provided by" the CFRA. [Citations.] A plaintiff can establish a prima facie case of retaliation in violation of the CFRA by showing the following: (1) the defendant was a covered employer; (2) the plaintiff was eligible for CFRA leave; (3) the plaintiff *exercised his or her right to take a qualifying leave*; and (4) the plaintiff suffered an adverse employment action *because he or she exercised the right to take CFRA leave*. [Citation.]" (*Rogers v. County of Los Angeles* (2011) 198 Cal.App.4th 480, 490-491, first italics added.)

Here, as we have already discussed, Choochagi failed to present evidence raising a triable issue as to whether he actually requested CFRA leave. Because there is no evidence of such a request, Choochagi could not have suffered an adverse employment action *because* he exercised his right to take CFRA leave. Summary adjudication of this claim was therefore appropriate.

### c. The trial court applied the correct legal test when it ruled on summary adjudication

Choochagi contends that in the course of its summary adjudication analysis, the trial court employed an erroneous analysis. Choochagi asserts that "the trial court erroneously applied the *McDonnell Douglas* test"[1] when it assessed his CFRA interference claim.

Under *McDonnell Douglas*, courts use a burden-shifting framework to assess claims alleging employment discrimination or retaliation. (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 860.) In the summary judgment context, " 'the employer, as the moving party, has the initial burden to present admissible evidence showing either that one or more elements of plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory [or retaliatory] factors.' " (*Id.* at p. 861.) If the employer meets this initial burden, the plaintiff must " 'demonstrate a triable issue by producing substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with discriminatory [or retaliatory] animus, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination [or retaliation] or other unlawful action.' " (*Ibid.*)

Choochagi's claim that the court employed an erroneous analysis is not supported by the record before us. While the *McDonnell Douglas* burden-shifting analysis does not apply to CFRA interference claims, it *does apply* to CFRA retaliation claims. (*Moore v. Regents of University of California* (2016) 248 Cal.App.4th 216, 250.) Here, in granting summary adjudication on Choochagi's CFRA claim, the trial court found that Barracuda had established a "legitimate, non-retaliatory reason for [Choochagi's] termination," and that Choochagi failed to "present evidence" in opposition to show that "Barracuda's proffered reason was pretextual" and that the "single day he requested and took off . . .

---

[1] *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792.

was a substantial motivating factor in his termination." The trial court thus stated its straightforward application of the *McDonnell Douglas* burden-shifting framework to Choochagi's claim that he was the subject of a retaliatory termination.

However, the trial court *also* stated: "Additionally, [Choochagi] does not submit evidence which demonstrates that he requested additional time off due to his medical condition and was denied such leave." With this statement, which dealt with the CFRA interference claim, the trial court clearly did not adopt the *McDonnell Douglas* framework—it simply indicated that Choochagi failed to submit evidence demonstrating an element of his claim. The trial court's order on Barracuda's summary judgment or adjudication motion thus reflects that the trial court properly engaged in a bifurcated analysis of the CFRA claims, first applying the *McDonnell Douglas* framework to the retaliation claim and then analyzing the interference claim to determine whether the evidence demonstrated Choochagi even made a CFRA leave request, without application of the *McDonnell Douglas* burden-shifting framework. Thus, the trial court did not err in its application of the *McDonnell Douglas* test to Choochagi's CFRA claim.

Next, Choochagi argues that the trial court's findings on the CFRA retaliation claim contradict the court's findings on the disability discrimination claim. For the CFRA claim, as we explained above, the trial court found that Choochagi failed to present evidence that the reasons for termination were pretextual. Choochagi asserts that this contradicts the court's finding that triable issues of fact precluded summary adjudication on his disability discrimination claim.

A prima facie case of disability discrimination under FEHA requires the employee to show he or she (1) suffered from a disability, (2) was otherwise qualified to do his or her job, and (3) was subjected to adverse employment action because of the disability. (*Faust v. California Portland Cement Co.* (2007) 150 Cal.App.4th 864, 886.) Once the employee establishes his or her prima facie case, "the burden then shifts to the employer to offer a legitimate, nondiscriminatory reason for the adverse employment action."

12

(*Deschene v. Pinole Point Steel Co.* (1999) 76 Cal.App.4th 33, 44.)  The employee may still defeat the employer's showing with evidence that the stated reason is pretextual, the employer acted with discriminatory animus, or other evidence permitting a reasonable trier of fact to conclude the employer intentionally discriminated.  (*Ibid.*)

At summary adjudication, the trial court concluded that Barracuda met its initial burden of showing that it had a legitimate, non-discriminatory reason for Choochagi's termination, "namely, his shortcomings as a manager and failure to meet expectations and the needs of the company."  The court also found that Barracuda met its burden to show that the decisionmakers "were not aware of his medical condition when the decision was made."  However, the court then found that Choochagi raised a triable issue of fact as to whether the proffered reason was pretextual, given that Choochagi's "medical issues flared and were disclosed" at around the same time as Choochagi's final performance review, which was arguably positive.

We see no contradiction in the trial court's decision to grant summary adjudication on the CFRA claim but deny summary adjudication on the FEHA disability discrimination claim.  With respect to the CFRA retaliation cause of action, the trial court found that Barracuda had established a legitimate, non-retaliatory reason for Choochagi's termination.  It then found that Choochagi failed "to present evidence which demonstrate[d] that Barracuda's proffered reason was pretextual *and that the single day he requested and took off due to his migraine headaches . . . was a substantial motivating factor in his termination.*"  (Italics added.)  Thus, in evaluating the CFRA claim, the trial court appropriately focused on whether Choochagi made a specific and valid CFRA-leave request, and whether that leave request was a basis for Barracuda's termination of Choochagi.  In its consideration of the FEHA disability discrimination claim, the court focused on a different question—whether Choochagi's purported disability, more broadly, was a motivating factor for his termination.  The disability discrimination claim raised a different question, and the trial court did not err in reaching a different

13

conclusion based on the evidence before it on that issue. Choochagi's assertion that the trial court erred by issuing inconsistent rulings on the two claims is without merit.

### 2. FEHA Claims

#### a. Retaliation

Choochagi alleged that he was terminated in retaliation for taking an action protected by FEHA, specifically, when he complained to HR regarding Ghazizadeh. On summary adjudication, the trial court found that Barracuda demonstrated that the individuals responsible for making the decision to terminate Choochagi's employment, Hughes and Esposito, were not aware of the HR complaint.

"[I]n order to establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.)

In the trial court, Barracuda established that neither of the decision makers, Hughes or Esposito, had any knowledge of Choochagi's May 2013 HR complaint about Ghazizadeh. Choochagi did not dispute this material fact. Thus, Barracuda met its initial burden of showing that there was no causal link between the protected activity and the decision to terminate Choochagi.

Choochagi contends that even if the decision makers did not know about the HR complaint, Ghazizadeh's animus toward Choochagi "permeated" the decision-making process, such that a retaliatory motive cannot be excluded from the decision to terminate Choochagi. In so doing, Choochagi relies on the "cat's paw" theory of liability, which was articulated by this court in *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95 (*Reeves*).

*Reeves* involved the decision of grocery store management to fire one of its clerks after an incident in which the clerk allegedly pushed a floor manager and engaged in

14

other inappropriate conduct. (*Reeves*, *supra*, 121 Cal.App.4th at pp. 100, 104.) The district manager responsible for the termination decision was not aware that the clerk had previously complained several times to mid-level managers about sexual harassment at the store. (*Id.* at p. 105.) The managers, who apparently had ignored the sexual harassment complaints, investigated the pushing incident and recommended termination to the district manager. (*Id.* at pp. 103-105.) The plaintiff sued for retaliation under the FEHA and the trial court granted the defendant's motion for summary judgment, finding under *McDonnell Douglas* that the plaintiff had failed to raise a triable issue of material fact in response to the defendant's proffer of a legitimate reason for the termination based on the alleged battery of the store manager. (*Reeves*, at p. 105.)

This court reversed, explaining that a plaintiff can establish that "retaliatory animus was a but-for cause of the employer's adverse action" by showing "that any of the persons involved in bringing about the adverse action held the requisite animus, provided that such person's animus operated as a 'but-for' cause, i.e., a force without which the adverse action would not have happened." (*Reeves*, *supra*, 121 Cal.App.4th at p. 108.) This concept is sometimes referred to as "cat's paw," where the actor who acted without animus "may be found to have operated as a mere instrumentality or conduit for others who acted out of discriminatory or retaliatory animus, and whose actions were a but-for cause of the challenged employment action." (*Id.* at p. 113.) As applied to the clerk's termination in *Reeves*, the court found the defendant had articulated a legitimate nondiscriminatory reason for its decision only with respect to the district manager who was unaware of the sexual harassment complaints. (*Id.* at pp. 112-113.) The nonretaliatory motive of the district manager was insufficient to rebut the claim entirely, since the process leading to the clerk's dismissal involved several actors, including the plaintiff's direct supervisor whose conduct raised triable issues as to whether he harbored a retaliatory motive which could be imputed to the employer. (*Id.* at p. 116.)

15

*Reeves*, and by extension the cat's paw theory, is inapplicable to this case. The evidence at the summary adjudication proceedings showed that Ghazizadeh's reports regarding Choochagi to Hughes, Brooks, and Esposito were mostly negative. Hughes stated that he considered Ghazizadeh's negative reviews in coming to the decision to terminate Choochagi. However, the evidence also showed that the decision makers independently identified deficiencies in Choochagi's performance based on their role as Choochagi's direct supervisors over the course of a year. Ghazizadeh was no longer Choochagi's direct supervisor, as Choochagi had been moved from Technical Support to Sales Engineering early in his tenure. The decision to terminate Choochagi's employment was informed by firsthand observations on the part of Hughes, Brooks, and Esposito. Thus, while the evidence showed that Ghazizadeh's feedback influenced, to some degree, these decision makers, the evidence failed to show that they acted as mere instrumentalities of Ghazizadeh. Put another way, there was no evidence that Ghazizadeh's negative comments about Choochagi's performance were a *but-for* cause of Choochagi's termination. Accordingly, summary adjudication on the FEHA retaliation claim was appropriate because there was no triable issue of fact as to whether a causal link existed between the protected activity and the adverse employment decision.

### b. *Failure to prevent*

In granting summary adjudication on Choochagi's claim that Barracuda failed to prevent discrimination and retaliation, the trial court found that Barracuda met its initial burden by submitting evidence that it had policies and procedures in place to prevent discrimination and harassment and that the company's HR department directed an immediate investigation of Choochagi's complaint about Ghazizadeh's conduct. Choochagi argues that in light of the trial court's erroneous ruling on his FEHA retaliation claim, reversal on his FEHA failure-to-prevent claim is also necessary.

"The employer's duty to prevent harassment and discrimination is affirmative and mandatory. [Citation.] Prompt investigation of a discrimination claim is a necessary step

16

by which an employer meets its obligation to ensure a discrimination-free work environment. [Citations.]" (*Northrop Grumman Corp. v. Workers' Comp. Appeals Bd.* (2002) 103 Cal.App.4th 1021, 1035-1036.) The FEHA mandates that the defendants, acting in good faith, conduct an investigation that is appropriate under the circumstances. (*Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93, 102.)

Here, Choochagi fails to demonstrate that triable issues of fact precluded summary adjudication of this issue. Barracuda submitted evidence that it promptly conducted an internal investigation in response to Choochagi's complaint about Ghazizadeh. On appeal, Choochagi does not meaningfully challenge that evidence; rather, he asserts that a successful reversal of his FEHA retaliation claim warrants reversal of this claim as well. As we explained, the trial court did not err in granting summary adjudication of the FEHA retaliation claim. Accordingly, we decline Choochagi's invitation to reverse the trial court's grant of summary adjudication on the failure-to-prevent claim.

## B. Judicial Bias

Choochagi argues that reversal is required because the trial court criticized his theory of pretext in front of the jury.

### 1. Procedural History

During trial, Choochagi's counsel questioned Barracuda's General Counsel, Diana Honda, about the company's "progressive discipline" procedures, asking: "What do you understand the term 'progressive discipline' to mean with regard to Barracuda?" Honda explained that the company had a progressive discipline policy for "certain types of circumstances" involving employees, including "theft, an illegal act, coming to work intoxicated, [and] repeated absences . . . ." Choochagi's counsel then asked, "if an employee who is having [performance] issues continues to have those issues," would that employee be progressively disciplined according to company policy? Honda disagreed with the question's premise, stating that in a situation involving "performance management . . . we would not be in a progressive discipline or a discipline discussion."

17

She explained that, in terms of Choochagi's performance, "[w]e didn't view this as a disciplinary matter.  This was a performance improvement and performance issue which is covered different[ly]."

Choochagi's counsel continued, asking that if an employee received a low performance evaluation, "the next step might be a performance improvement plan or some step in the progressive discipline process . . . ?"  Honda replied that Barracuda "would provide a performance improvement plan," or "would talk to the employee and try to coach them," or would give them additional resources.  It might be many things."  Choochagi's counsel returned to discussing the progressive discipline process, and then asked whether for someone like Choochagi, Barracuda had the option to engage in progressive discipline.  Barracuda's counsel objected, contending that Choochagi's counsel had misstated prior testimony.  The trial court sustained the objection.  Choochagi's counsel asked whether Choochagi had received any emails documenting his performance issues, and asked "[i]n terms of the disciplinary process what is that?"  Honda disagreed with the characterization, noting "you're the one who is putting this in a disciplinary process.  I am not putting this in a disciplinary process.  You're putting it in a disciplinary process.  [¶]  The company provided him feedback in a written evaluation.  [¶]  The company provided subsequent feedback through emails and through coaching from various managers for over a year after this evaluation to provide him information.  [¶]  You're asking what a verbal counseling was.  There were constant discussions.  You're asking about written counseling.  There were emails.  [¶]  But I'm not using these words, you are, because you're putting it in a disciplinary process.  The company didn't."

Choochagi's counsel moved to strike the answer as nonresponsive.  The trial court replied:  "Well, no, I disagree.  I think you're trying to combine two different concepts.  [¶]  Conduct warranting discipline.  [¶]  And performance."  Choochagi's counsel continued his questioning, with Honda later testifying that Choochagi was "given written counseling, if you want to call it that, through emails and other documents."  Counsel

18

then stated, "So you've changed your testimony. That's what I am trying to get to. So can you tell me, if you say there was written counseling, please identify those documents. Where is the written counseling?" Barracuda's counsel objected to the question as argumentative and lacking foundation. Choochagi's counsel explained that, "at first she said that the document . . . did not constitute progressive discipline. Now in response she said there [are] written documents. And so the jury is entitled to know what she's referring to, and that's all I'm trying to get to." The trial court responded: "Well, but, I don't think you're being quite fair because – and I think there's a distinction between efforts that a manager might take to improve performance as opposed to disciplining somebody for misconduct." Choochagi's counsel replied, "I agree with you. But in this case we know that he was terminated, so the question is: Did they follow their policy inside the manual in order to get there. [¶] If they're claiming they are following their policy, then this witness should be able to tell me the steps that they took in terms of that policy." Choochagi's counsel reiterated, "I don't dispute what the court has said."

Choochagi's counsel continued, contending that Barracuda was "trying to recharacterize those documents as though it was something it was not, progressive discipline. [¶] So I would like for them to identify documents. If it's progressive discipline, identify it. If it's not, then tell me it's not." The court stated, "But as I understand the position that the company has taken, is that there was no – it wasn't discipline. It was performance." The court later added, with respect to the emails, "And she acknowledged that is perhaps one way you could characterize that email message was some kind of verbal counseling, but it doesn't necessarily mean it's part of a progressive discipline system, unless I'm missing something."

### 2. *Analysis*

Choochagi asserts that the trial court's comments were "inappropriate," and indicated a "lack of belief" in his attempt to "prove that Barracuda failed to follow its own written policy of progressive discipline." Choochagi characterizes the trial court's

19

statements as indicating a belief that Choochagi was terminated for poor performance, "implying that Barracuda had no duty to follow its progressive discipline policy with Choochagi." Thus, he contends that "[t]he court's adoption of Barracuda's narrative that the progressive discipline policy did not apply undermined an important part of [his] pretext arguments, as well as [his] credibility to the jury."

"It is 'extraordinary' for an appellate court to find judicial bias amounting to a due process violation. [Citation.] The appellate court's role is not to examine whether the trial judge's behavior left something to be desired, or whether some comments would have been better left unsaid, but to determine whether the judge's behavior was so prejudicial it denied the party a fair, as opposed to a perfect, trial. [Citation.] Mere expressions of opinion, based on observation of the witnesses and evidence, do not demonstrate judicial bias. [Citation.]" (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 589.)

Here, nothing in the record indicates that Choochagi was denied a fair trial based on the trial court's comments. The comments did not discount Choochagi's theory of pretext.[2] Rather, the court's comments were explanations of why the court sustained the objections raised by Barracuda's trial counsel and denied the motion to strike by Choochagi's counsel. In addition, in making the comments, the court also attempted to clarify a distinction that was evident from Honda's testimony—that there was a difference between progressive discipline for infractions and counseling for performance issues. The trial court evidently drew this distinction to explain its rulings to the parties.

---

[2] Choochagi's theory of pretext is difficult to decipher. It appears that Choochagi attempted to establish that Barracuda failed to follow its progressive discipline policy, as outlined in the Employee Handbook, when it provided performance feedback to Choochagi. However, Honda repeatedly testified that the progressive discipline policy was only meant to apply "things like theft, an illegal act, coming to work intoxicated, [or] repeated absences," and not performance issues. Thus, the invocation of Barracuda's progressive discipline policy was inapposite, as there was never an allegation of misconduct covered by the progressive discipline policy.

Finally, not only was the court's characterization of the testimony correct, but Choochagi's counsel *agreed* with those characterizations, stating, "I agree with you" and "I don't dispute what the court has said." None of the comments demonstrated judicial bias, nor did they deny Choochagi a fair trial. Reversal is therefore not warranted under these facts.

## C. Evidentiary Ruling

Choochagi argues that the trial court abused its discretion when it allowed Barracuda to use evidence at trial that he claims was improperly withheld during discovery. He also argues that the error was "compounded" when the court issued an "explanatory instruction to the jury that implied that Choochagi, not Barracuda, had acted improperly."

### 1. Procedural History

During discovery, Choochagi requested the following from Barracuda (Request for Production 128): "Any and all DOCUMENTS that REFER, RELATE, or PERTAIN to any technical training completed by members of the Campbell SE Team from 2012 to the present, including but not limited to, training from Barracuda University."

At trial, Barracuda sought to introduce a report detailing Choochagi's participation in Barracuda University. Choochagi's counsel objected on the grounds that the report had not been produced during discovery. The trial court asked that further foundation be laid for the report. Honda testified that in preparation for trial, she had an employee review the relevant database and pull a report on Choochagi's participation at Barracuda University.[3] Honda testified that the report showed Choochagi completed four certifications when he worked at Barracuda, and that he took three additional webinar classes. Honda also testified that in comparison, another employee who worked on

_____

[3] According to Honda, Barracuda University is a series of courses and certifications used by Barracuda employees, as well as customers and partners, to enhance product knowledge.

Choochagi's team had completed over 50 certifications. At the conclusion of the direct examination, Choochagi's counsel again raised the issue that this document had been sought during discovery and that it had not been produced. Barracuda's counsel withdrew the document.

Choochagi's counsel continued, stating: "Oh, no, no, we don't get to withdraw it after we have a witness testify about it. We get to go through and indicate in detail how this document got here." Counsel proceeded to try to examine Honda about the request for production, but Barracuda's counsel interjected, noting that Barracuda had objected to the request for production "and there was no motion to compel or anything else filed. I'm offering to withdraw that. Obviously, he wants to question the witness." Choochagi's counsel responded: "You don't get to bait and switch. You don't get to spring things . . . [¶] . . . You don't get to spring things on the opposing party and then examine the witness. Let it be shown to the jury and then we don't get an opportunity to respond." Counsel continued: "It's already been displayed for the jury. There's been testimony about it. [¶] I would like to have the 30 seconds to confirm that this document was available to them, that they did not produce it, and still provided an objection. It is a bait and switch. I asked for it not to be introduced. I asked for it not to go on –" The court interjected: "Okay. Okay. I can read. And I'll make a finding that, in fact, it appears this document would be responsive to the production demand number 128." The court ruled the document would not be admitted.

In a subsequent hearing outside the presence of the jury, the trial court addressed the Barracuda University report and heard arguments regarding whether it was subject to discovery. Barracuda's counsel stated that because other Requests for Production referred specifically to Choochagi with regard to certain documents, they concluded that the reference to Campbell SE Team did not include Choochagi. Barracuda's counsel asked the court to give an explanatory instruction to "the jury of what happened so that this issue doesn't come up during closings and has been properly resolved on the record,

22

because once again, we were accused of withholding, sandbagging and some other fairly unprofessional conduct." In support of the requested instruction, Barracuda's counsel noted that Choochagi never filed a motion to compel and that there was a good faith dispute as to whether the document fell within that identified category. The trial court agreed to give Barracuda's requested instruction. Choochagi's counsel objected "because it implies I did something wrong." The trial court responded that it "didn't read [the instruction] that way."

The trial court gave the following instruction: "During the examination of Diane Honda yesterday, counsel for [Choochagi] made statements in front of the jury about the conduct of Barracuda Networks and its counsel regarding a document which I eventually ruled was inadmissible. My ruling on the document in no way reflects that Barracuda Networks or its counsel improperly withheld any documents from [Choochagi] or otherwise did anything inappropriate. Reasonable counsel may differ as to whether the excluded document was in fact requested by [Choochagi] in the first instance. [¶] [Choochagi's counsel's] comments in front of the jury must be ignored by you, as the court merely made an evidentiary ruling. [¶] Further, the court specifically finds that neither Barracuda Networks nor its counsel engaged in any inappropriate conduct concerning the excluded document."

### 2. *Analysis*

Choochagi claims that he was prejudiced by the discussion of the Barracuda University document. We disagree. First, the discussion of the document was brief, and it was ultimately withdrawn by Barracuda and excluded by from the jury's consideration by the trial court. Prior to deliberations, the jury was instructed to consider only documents, testimony, or exhibits that were admitted into evidence. "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions. [Citation.]" (*People v. Sanchez* (2001) 26 Cal.4th 834,

23

852.) We therefore presume that the jury ignored the evidence that Choochagi claims was improperly withheld during discovery.

We next address Choochagi's claim that the instruction on the incident involving the Barracuda University evidence was reversible error. "A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.) "[T]here is no rule of automatic reversal or 'inherent' prejudice applicable to any category of civil instructional error, whether of commission or omission. A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' [Citation.] . . . [¶] Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' " (*Id.* at p. 580.) "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

We need not determine whether the challenged instruction was erroneously given because, under these facts, it is not reasonably probable that the instruction affected the verdict. The instruction informed the jury that the court had made an evidentiary ruling, and that it should not conclude from that evidentiary ruling that any party had acted inappropriately. It also alerted the jury to the fact that the court's evidentiary ruling did not mean that Barracuda had acted inappropriately. The instruction did not pertain to any substantive issue involving the remaining causes of action, and did not direct the jury to come to any conclusion regarding those causes of action. If anything, it reminded the jury that the evidence involved in that incident was *not* to be considered in deliberations because it had been specifically excluded. Thus, it is not reasonably probable that the

24

challenged instruction affected the verdict and that in its absence Choochagi would have obtained a more favorable result.

### D. *Motion for New Trial*

Choochagi filed a motion for new trial, which was ultimately denied after the court concluded that it was without jurisdiction to hear the motion. Choochagi argues that the trial court abused its discretion by setting his motion for new trial hearing after the statutory deadline to hear such motions.

At the time relevant to these proceedings, Code of Civil Procedure section 660[4] provided: "[T]he power of the court to rule on a motion for a new trial shall expire 60 days from and after the mailing of notice of entry of judgment by the clerk of the court pursuant to Section 664.5 or 60 days from and after service on the moving party by any party of written notice of the entry of the judgment, whichever is earlier, or if such notice has not theretofore been given, then 60 days after filing of the first notice of intention to move for a new trial. If such motion is not determined within said period of 60 days, or within said period as thus extended, the effect shall be a denial of the motion without further order of the court . . . ." Under Code of Civil Procedure section 661, "[u]pon the expiration of the time to file counter-affidavits the clerk forthwith shall call the motion to the attention of the judge who presided at the trial, or the judge acting in his place, as the case may be, and such judge thereupon shall designate the time for oral argument, if any, to be had on said motion." It further provides, as relevant here, that "[s]uch motion . . . shall be argued . . . not later than ten (10) days before the expiration of the time within which the court has power to pass on the same."

"The 60-day period under section 660 is mandatory and jurisdictional. [Citations.] The period may not be enlarged under the rubric of mistake, inadvertence, surprise, excusable neglect under [Code of Civil Procedure] section 473 or by means of a nunc pro

---

[4] Effective January 1, 2019, Code of Civil Procedure section 660 was amended to change the 60-day statutory deadline to a 75-day deadline. (Stats. 2018, § 1, ch. 317.)

tunc order.  [Citations.]  '[A]n order made after the 60-day period purporting to rule on a motion for new trial is in excess of the court's jurisdiction and void.'  [Citation.]" (*Dodge v. Superior Court* (2000) 77 Cal.App.4th 513, 517-518.)

In the context of a motion for new trial, " '[i]t is the duty of the party to be present and see that his motion for new trial is set for hearing within the statutory time.  If it has been inadvertently continued by the court to a date too late under the statute the party should move the court to advance the matter on the calendar.  When he is guilty of lack of diligence in the prosecution and presentation of his motion, he cannot complain of the court's inadvertence.' " (*In re Shepard's Estate* (1963) 221 Cal.App.2d 70, 74.)  In this case, after Choochagi filed a motion for new trial, the matter was set for hearing after the statutory deadline to hear the motion.  On July 19, 2017, two days after filing his motion for new trial, Choochagi filed a "Notice of Errata Re: Plaintiff's Motion for New Trial," in which he acknowledged that the hearing was set for August 25, 2017, and substituted an exhibit.  Clearly the date of the hearing was known to Choochagi.  At that point, Choochagi should have alerted the court to advance the matter on the calendar.  Choochagi cannot complain on appeal of the court's inadvertence.

In any event, we discern no prejudice from the trial court's failure to timely consider and rule on the motion for new trial.  Put simply, the claims raised in the motion for new trial are the same issues raised in the appeal before us.  We have evaluated those claims on their merits, and concluded that Choochagi has shown no error.  Thus, there is no conceivable prejudice from the trial court's setting of the motion for new trial and reversal of the judgment is not warranted.

### III.  DISPOSITION

The judgment is affirmed.

26

_____
Greenwood, P.J.

WE CONCUR:


_____
Grover, J.


_____
 Danner, J.


Choochagi v. Barracuda Networks, Inc.
No. H045194

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| GEORGE CHOOCHAGI, | H045194 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. 14-CV-270651) |
| v. | |
| BARRACUDA NETWORKS, INC., | |
| Defendant and Respondent. | |

BY THE COURT:

The opinion which was filed on December 30, 2020, is certified for publication.

_____
Greenwood, P.J.

_____
Grover, J.

_____
Danner, J.

The written opinion which was filed on December 30, 2020, has now been certified for publication pursuant to rule 8.1105(b) of the California Rules of Court, and it is therefore ordered that the opinion be published in the official reports.

Dated: _____   _____
Greenwood, P.J.

| Trial Court: | Santa Clara County Superior Court |
| | Superior Court No.: 14-CV-270651 |

| Trial Judges: | The Honorable William J. Elfving |
| | The Honorable Derek Woodhouse |

Attorney for Defendant and Respondent,
BARRACUDA NETWORKS, INC.:

Jonathan Michael Cohen
Joseph & Cohen, P.C.

Diane Ceonzo Honda

Attorneys for Plaintiff and Appellant,
GEORGE CHOOCHAGI:

Shadie Latae Berenji
Berenji Law Firm

John Bernard Alexander III
Tracy Lee Fehr
ALEXANDER MORRISON + FEHR LLP

Choochagi v. Barracuda Networks, Inc.
H045194